(No. 24059.—

The Shell Petroleum Corporation, Plaintiff in Error, *vs.* The Industrial Commission *et al.*—(Wilhelmina Schriever, Defendant in Error.)

*Opinion filed June 11, 1937—Rehearing denied October 7, 1937.*

Acton, Acton & Baldwin, (W. M. Acton, and M. E. Grant, of counsel,) for plaintiff in error.

Walter V. Dysert, and Hutton & Clark, for defendant in error.

Mr. Justice Shaw delivered the opinion of the court:

This cause comes before us on a writ of error granted to review a judgment of the circuit court of Vermilion county, which confirmed an award of the Industrial Commission in favor of the respondent, Wilhelmina Schriever, as conservatrix of Fred Schriever, incompetent, against the Shell Petroleum Corporation. The cause was first heard before an arbitrator who entered an award. On appeal to the commission, additional testimony was taken, the award was confirmed and was later reviewed by *certiorari* in the circuit court. That court set aside the award and remanded the cause to the Industrial Commission, with directions to exclude certain incompetent testimony, in which expert witnesses had been permitted to answer hypothetical questions which did not include all of the facts or case his-

tory. Pursuant to the remandment, additional testimony was taken and an award entered by the commission in the sum of $3750, and a pension, for life, of $300 per year. Upon a further review by the circuit court, this award was confirmed.

A proper understanding of the case requires a statement of the life history of the incompetent, Fred Schriever, putting the various events in their proper chronological order. From different parts of the record, and especially from a history which Fred Schriever gave to the Mayo clinic, and which was introduced in evidence by stipulation, the following appears to us to be a correct statement.

Fred Schriever was born in 1883, and at the age of seventeen suffered from diphtheria, scarlet fever and pneumonia. Seven years later, in 1907, he had malaria, and, eight years thereafter, suffered a skull injury which rendered him unconscious for a few minutes. Nothing appears in the record as to his condition from 1915 until 1927, but in that year he began having severe headaches daily, and also was afflicted by vomiting every morning and sometimes during the day. In the following year he suffered from typhoid and influenza, and in the next year, 1929, he had rheumatic fever and pleurisy. During the year 1929, he started from his home to go to the Mayo Clinic at Rochester, Minnesota, but became so ill enroute that he had to be taken back to Danville, where he was operated on for the removal of his gall bladder and appendix. In the course of this operation the surgeons broke a needle, which they found it inadvisable to remove at the time, but which was later taken out at a secondary, minor operation. Following this operation his condition did not improve, but he developed paresthesia in the right arm and leg, accompanied by incoördination of his muscles, tremor in the hands, together with sleeplessness and other symptoms. The vomiting continued and the headaches came to be more severe and frequent. On July 27, 1930,

Schriever was working for the plaintiff in error, the Shell Petroleum Corporation, in charge of an oil station, and, during the course of a robbery of that station, he was knocked unconscious by one of the robbers, who hit him over the head with the butt end of a pistol. He was rendered unconscious for a short time, remained at home for about ten days and then went back to work, his physician reporting him to have fully recovered. Approximately one month later, August 25, 1930, he went to the Mayo Clinic, where his case history was taken as hereinabove stated. A diagnosis made at the Mayo Clinic (in which all of the other doctors, both for and against the respondent, seemed to concur) was that Fred Schriever was suffering from Parkinson's disease, which appears to be a mental, nervous and, to some extent, muscular breakdown, following an attack of sleeping sickness.

On July 8, 1931, about eleven months after the visit to the Mayo Clinic, Schriever, by his attorneys, filed his declaration in the circuit court of Vermilion county against the surgeons who had operated on him for his apparent gall bladder and appendix trouble. The third count of this declaration charged that on September 15, 1929, and for a long time theretofore, the plaintiff was suffering from a sickness and malady commonly known to the medical profession as Parkinson's disease, which the defendants knew, or could have known by the exercise of ordinary care, and that, if an operation is performed on one suffering with Parkinson's disease, the usual effect would be to aggravate and accelerate such disease and cause a nervous breakdown, and that, notwithstanding such fact, the defendants operated on the plaintiff while the plaintiff was afflicted with Parkinson's disease and thereby the malady and sickness was greatly aggravated and increased, and, by reason thereof, the plaintiff suffered lapses of memory and became so affected that he is a physical and nervous wreck and incurably so, all as a result of the defendant's negligence.

This case appears to have been dismissed without settlement, and the lawyer who was first employed to handle it, testified that the declaration was prepared after various conversations with Fred Schriever, his wife and his daughter. He testified that Schriever told him about going to the Mayo Clinic for an examination and told him that Mayos said he had Parkinson's disease.

There seems to be no dispute but that Schriever has become a mental and nervous wreck and that he is totally incapacitated. The only point to be considered is whether or not there is any causal relationship between the blow which he received on the head during the robbery, and his present condition. On that point we will go into the medical and expert testimony.

The medical testimony on the question of whether or not there was any causal connection between the blow on the head which Schriever received during the hold-up, and his disability, which was introduced before the commission, consisted of evidence offered by Dr. T. E. Walton, on behalf of the employee, and the testimony of Dr. Frank D. Norbury, of Jacksonville, Illinois, and Dr. F. N. Cloyd, of Danville, on behalf of the plaintiff in error. For the employee Dr. Walton was asked a hypothetical question containing substantially all of the facts set forth in the earlier part of this opinion, and was then asked, "Now, doctor, have you an opinion as a medical man, based upon these facts, whether there could be any medical certainty that the alleged assault on July 27, 1930, did, or did not, cause the present condition?" to which the witness replied, (after an intermediate question and objection) "The injury would produce some trauma of the brain. As to the causative factor of his condition, whether it was one of the causative factors, there are several others." This answer was stricken, and the previous question, in substance, was repeated, to which the witness said, "I don't think I can answer that except as one of the causative factors." He was

then asked if he could answer yes or no and said, "To the general question, I would say no, it wasn't the cause." He was then asked whether he had an opinion, as a medical man, whether there could be any medical certainty that the alleged assault caused the condition and the witness said, "You say 'certainty'?" and the attorney then asked if there was any medical certainty. The witness then said, "I can't state yes to that question. I don't think there is a medical certainty. There is a very strong probability. I have an opinion. I have not a certainty, my opinion is that it is a causative factor; could cause this condition—not alone, I don't think so. I don't think it could cause it alone, the injury, I mean." The witness' answers to further questions stated that the blow could produce the condition by inciting the degenerative processes in the brain, and, in response to several further questions, gave it as his opinion that the Parkinson disease could result from the facts stated in the hypothetical question, but, at no time, stated that the blow on the head could, with any medical certainty, be stated to have caused the existing disability. On cross-examination, this witness said that, before there could be any connection between the head injury and the subsequent disability, it would be necessary to know that the blow on the head had caused a brain lesion. It must be noted, in this connection, that there is no evidence in the record of the existence of any brain lesion. On further cross-examination, the doctor stated that the present condition might be caused by constitutional disease, influenza, excessive mental strain and encephalitis lethargica, or long continued anxiety, and that, besides the blow on the head, a number of other factors in the case history might have been the possible source of the existing disability. A careful reading of the testimony of this doctor fails to disclose that he, at any time, definitely stated that there was any reasonable medical certainty of a causal relationship between the blow on the head and the employee's total break down.

The most he said, at any time, was that there could be such a connection.

Dr. Frank Norbury testified that he was a physician and surgeon and had specialized in nervous and mental cases for forty-seven years; that he owns and operates a private sanatorium at Jacksonville, Illinois, and that he had seen and treated, in all, probably one hundred cases of Parkinson's disease, which he also called, "paralysis agitans." He stated that there are two types of this disease,—the senile type and the type that follows acute infections,—such as from influenza or encephalitis lethargica and other types of encephalitis. He said that the senile type comes on at about the age of sixty or sixty-five, and is an incident of old age, and that the changes incident to it are vascular, that is, in the blood supply to basal ganglion; that, in the senile type, Parkinson's disease is localized, so far as its anatomy is concerned. The basal ganglion is below the cortex of the brain. He then testified that the other form is different, in that it follows encephalitis, and is an acute infectious condition due to a virus which localizes itself in the basal ganglia. Dr. Norbury further testified that he was seventy-two years old and was, himself, afflicted with Parkinson's disease, although he had the appearance of good health. It was his testimony that a blow over the fore part or the upper part of the head, such as being struck on the head with a revolver, would have to produce lacerations of the cerebellum before it could affect the basal ganglia, and that, in his opinion, it would not affect the basal ganglia, because it would act on another portion of the brain, and gave it as his definite opinion, that it would not; that, in his opinion, the basal ganglia could not be affected by such a blow, because it would not be reachable in that way. In response to a long, hypothetical question, which gave the entire case history, very much as it has been outlined in the foregoing part of this opinion, the doctor gave it as his opinion that

the blow on the head did not cause the trouble, but that the case was a syndrome of encephalitis; that there was no causal relationship between the condition and the blow, and that, in his opinion, the blow on the head did not figure in the complex, stating definitely that he did not think that the injury of July 27, 1930, had anything to do with the hypothetical man's present disability. He was asked: "Q. I wish you would state, doctor, in your own way, the reasons you have for thinking that the injury had nothing to do with the subsequent disability?" "A. You have to take into consideration the history—the whole history. You have outlined an attack back in 1928, which was diagnosed as influenza, which, in my judgment, was the inception of the original infection of the encephalitis. I have been through that experience myself. The inception, in this case, came with the attack which was diagnosed as influenza. The syndrome commences that way. The fever does not last long. Then, after that, follow the neurological symptoms which, in their gradual development, fashion into a more conspicuous and discernible type of what we term a syndrome. A syndrome means a picture. It is a group of symptoms, a composite of the varying pathology. Now, Parkinson's syndrome is definite, and this encephalitis is a chronic, progressive disease. Once you have the encephalitis you have it the rest of your life. You may have a recrudescence occasioned by influenza, or by bronchial penumonia. With bronchial pneumonia, after that subsides, it leaves other symptoms more conspicuous. Now, the result of any encephalitis depends on how much injury is done to the brain and the location. You may have the cortex involved and you may involve, in some degree, the basal ganglia. You may have others associated, but when it is complete in the basal ganglia, then you get Parkinson's disease, so I think, taking the history as given to me, it will follow Parkinson's syndrome from the beginning up to the present time. You have got your picture

there, irrespective of traumatism. Parkinson's disease follows influenza and it follows encephalitis. Encephalitis is preceded frequently by influenza. Encephalitis is the inflammation of the gray matter of the brain, and it may be in the cortex, but it is more likely in the basal ganglia, which is the forceful portion of the brain, where the cells are located which are concerned with bringing nervous energy into action and with the division of nervous energy."

Dr. Norbury's testimony was the same on cross-examination, and, with reference to various text-books which were suggested in questions, he stated that he did not think that any modern author could be found who had studied pathology, who would say that trauma is a cause of paralysis agitans, which he said is another name for Parkinson's disease, Parkinson having first outlined the specific disease and being the doctor for whom it was named. On cross-examination, the witness further stated that he refused to accept trauma as a cause of Parkinson's disease.

Dr. F. N. Cloyd, of Danville, who has been practicing medicine since 1894, gave testimony which is substantially identical, in its conclusions, with that of Dr. Norbury. He gave it as his opinion that the injury did not cause the condition, and that he did not see any connection between the injury and the total disability of the hypothetical man.

It must be noted that there is no substantial controversy as to any disputed question of fact apparent in this record. The defendant in error introduced the evidence of twelve or thirteen lay witnesses to prove that, prior to the robbery, Schriever was apparently in good health, and that sometime after the injury he appeared to be declining and that, by the spring of 1931, he had become a nervous and physical wreck, and was totally and permanently disabled. These facts are not in any way controverted, nor are they, to any degree, inconsistent with the medical testimony on both sides of the case. It is conclusively established, by all of the medical evidence, that

this man suffered from Parkinson's disease, and that he had it for at least two years prior to this injury, and there is nothing in the evidence to show any change in his condition, either physical or mental, subsequent to the injury, other than the gradual development and eventual consummation of that malady. As we have above pointed out, there was no evidence introduced by which there could be said to be even a probability that the injury might have had any causal relation to the disability without proof of a brain lesion, and on this point one of the doctors employed by the injured person, and who testified for him on the first hearing prior to the remandment, testified that he found no lesion of the brain. Considering the entire record, in the light of the testimony of all·of the doctors, we find nothing more than a typical case of Parkinson's disease, accompanied by its usual symptoms and pursuing its usual course. There is no evidence to indicate that there is any medical certainty, whatever, that the injury had anything to do with the disability here shown. .

Liability under the Workmen's Compensation act may not be based upon imagination, speculation or conjecture, but must have a foundation of facts established by a preponderance of the evidence, and where such facts are not so established the judgment must be reversed. *Jolly* v. *Industrial Com.* 341 Ill. 46; *Barto* v. *Industrial Com.* 359 id. 625; *Harding Co.* v. *Industrial Com.* 355 id. 139; *Rittler* v. *Industrial Com.* 351 id. 338; *Conreaux* v. *Industrial Com.* 354 id. 456.

On the record before us the judgment of the circuit court must be reversed, and the award set aside.

*Judgment reversed; award set aside.*