George C. Peterson, Administrator of Estate of Margaret Eckert Peterson, Deceased, Appellant, v. Cochran and McCluer Company et al., Appellee.

Gen. No. 41,263.

Opinion filed January 22, 1941.

CRAHEN, SULLIVAN, O'TOOLE & SULLIVAN, of Chicago, for appellant; JOHN E. CRAHEN, of counsel.

GARDNER, CARTON & DOUGLAS, of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

On June 24, 1936, George C. Peterson, as administrator of the estate of Margaret Eckert Peterson, deceased, filed a complaint in the circuit court of Cook county and therein sought damages for the death of his intestate because of injuries received by her in a fall which took place on April 27, 1936, in the hallway of a building located at 6110 North Claremont avenue, Chicago, which building was under the management and control of the defendant, Cochran & McCluer Company, a corporation. August Reschke and Charles P. Morrow were named as additional defendants. Issue was joined and the case tried before the court and a jury. August Reschke was dismissed out of the suit

and the court directed a verdict in favor of Charles P. Morrow. The trial resulted in a verdict finding the remaining defendant, Cochran & McCluer Company, not guilty. Motions made by plaintiff for judgment in his favor notwithstanding the verdict and for a new trial were denied, and judgment on the verdict was entered against plaintiff, to reverse which this appeal is prosecuted.

On Monday, April 27, 1936, Margaret Eckert Peterson and her husband, who is the plaintiff, together with their son Robert Grant Peterson, lived in an apartment on the third floor of the 6-apartment building at 6110 North Claremont avenue, Chicago. She was 38 years of age and Robert was 13 years of age. The stairway ran from the vestibule on the first floor to the top of the building and was carpeted with a runner that ran lengthwise down the stairs. On the landing immediately below the third floor there was a 7-foot carpet, which ran crosswise and was tacked to and over the carpet that ran up the stairs. The only occurrence witness was Esther Johnson, who testified for plaintiff that she worked at Mrs. Peterson's home as a maid once every other week; that on Monday, April 27, 1936, she was so employed; that about 5 p. m. Mrs. Peterson went out shopping; that after Mrs. Peterson was gone about an hour, witness heard some noise out on the stairway, and that she opened the door and went out to see what it was; that Mrs. Peterson was lying on the landing (between the second and third floor) trying to get up; that her attention was attracted by a sound like something falling; that witness opened the door as soon as she heard the sound and saw Mrs. Peterson trying to pick herself up; that Mrs. Peterson had two bags; that "when I first saw her I noticed that the bundles were on the floor. I then helped Mrs. Peterson in. I went down to where she was. She was on that little landing. I mean the second landing. I helped her in and wiped her forehead out and took

some ice out of the refrigerator and put it on her head. As I was helping her up the stairs I noticed that she had a big lump on her head. It was bleeding a little. It was on top of her left eye, perhaps a little more than an inch and a half above the left eye. It seemed to hurt her quite a bit. She felt kind of sick. When she got in the apartment I put ice on her head and then she went to lay down in her bedroom. I think it was about a half hour later that Mr. Peterson came home.'' In answer to a question as to whether there was any change in the condition on the forehead after Mrs. Peterson was brought into the apartment, witness said: ''It was growing pretty fast.'' Shortly thereafter, Mrs. Johnson went home and she did not again see Mrs. Peterson alive. When plaintiff reached home he found his wife in bed and noticed a lump on her head in the region of her temple, which had been cut a little and which had been bleeding. Ice packs were applied and she appeared more or less dazed. During that night she was very nervous and slept very fitfully and very restlessly. This condition did not improve, but a physician was not consulted until Thursday, April 30, 1936. Plaintiff and his wife then visited the family physician, Dr. John Hollison, Jr., whose office was located in the vicinity. Dr. Hollison found pus underneath the scab. He lifted the scab, cleaned the pus out, applied an antiseptic and then put an adhesive bandage on the wound. On this visit to Dr. Hollison, Mrs. Peterson was very nervous. The laceration healed up perfectly. Mrs. Peterson did not see the doctor again until Thursday, May 7, 1936, at which time a more thorough examination was made. Dr. Hollison advised the application of either hot or cold compresses. When she returned to her home, hot applications were applied. When no relief was afforded, cold applications were applied. About 9 o'clock that evening (May 7, 1936) Mrs. Peterson was suffering severe pain and Dr. Hollison was called to

her home. He administered a hypodermic and she went to sleep. She awakened during the night and attempted to walk from her bedroom to the bathroom but fell in the hallway and was assisted back to her bed. She then became nauseated and vomited. Shortly thereafter, owing to the seriousness of her illness, she was removed to a hospital, where she died at 7:30 the following morning, May 8, 1936. The testimony shows that prior to the evening of April 27, 1936, Mrs. Peterson enjoyed good health and had never been treated by a physician for any serious illness.

Dr. John F. McNamara, an expert called by plaintiff, answering a hypothetical question, testified that:

"The patient had a low gland infection which gradually invaded all the tissues it could invade. It could find no egress to the outside because the wound was sealed over and a parotitis gradually progressed to the neck, and where there was septic process in existence—and the only way you can explain a rather sudden death is that—and violent vomiting, temperature of 103.2 according to the evidence, and that there was a pyemia resulting in death. By the term 'pyemia' I mean the products of this gathering broke into the bloodstream and that shows there could have been pus in the bloodstream. By 'edema' I mean the swelling of the tissues. The drainage in that area starts in the periauricular glands, those glands in front of the ear, down into the neck, follows the lymphatic glands, the drainage." The only evidence connecting the alleged injury and the death of Mrs. Peterson is this answer which Dr. McNamara made to the hypothetical question. The plaintiff is required to establish a causal connection between the death and the alleged accident. On cross examination Dr. McNamara was asked to consider certain facts which defendants contend are undisputed, and he answered that if those were the facts he would change his opinion as to the cause of death. He testified that "it took twelve days

for this patient to die, I believe. It would make a difference in my answer if I knew that the wound over the eye had disappeared, and healed perfectly at the time the patient wént back to the doctor for the second time.'' Dr. Paul G. Schmitt, a coroner's pathologist, called by defendant, testified that in the presence of Dr. Hollison he performed a post mortem examination on the body of the deceased on or about May 8, 1936. His opinion was that there was no connection between the trauma and the cause of death. He further testified that ''my reason is that the post mortem findings show that the wound which is in question, or the lesion, there was no trace left of it. It was completely healed. The skin had grown—her epithelium—had grown completely closed there and underneath, across this supposed lesion there was no infection or inflammation of any type. The pathology, or disease, which was found was a considerable distance away from there, and the intervening tissues showed no evidence of inflammation. Had there been a connecting link between the two, anatomically we should be likely to find the original focus in the original wound with evidence of infection or inflammation gradually following the tissues down the side of the head to the point of the face and neck, at the point in question where the diseased structures were found.'' On cross-examination, Dr. Schmitt testified that in examining the body he found evidence of inflammation of the parotid gland, that he found acute parotitis, which is commonly called mumps. Dr. Joseph E. Schaefer, who confines his practice to injuries and infections and things occurring about the face and neck, called by defendant, testified as an expert in support of the theory of the defendant that there was no causal connection between the alleged fall of the deceased and her death. It is obvious that there was presented to the jury competent evidence from which it could find that the defendant was not guilty of negligence proximately

contributing to the death of Mrs. Peterson, and also competent evidence that there was no causal connection between the alleged injury in the hallway and her death. There is competent evidence in the record from which the jury would be justified in returning a verdict that the death of Mrs. Peterson was not caused by the alleged accident. There is testimony that the laceration on the forehead could not have caused the subsequent parotitis (mumps), because had it done so the post mortem examination would have demonstrated a direct pathway between the original wound and the gland itself. The wound on the forehead had healed and was not even apparent at the time of the post mortem examination.

Plaintiff contends that deceased was caused to trip and fall forward by reason of the defective condition of the carpet on the stairway. There was a conflict in the evidence concerning the condition of the carpet before and on the evening of the alleged accident.

The first criticism leveled at the judgment is that the verdict is contrary to the manifest weight of the evidence. We have studied the testimony and photograph and find that the verdict is not against the manifest weight of the evidence. The proposition as to whether the defendant was guilty of the negligence charged was within the province of the jury, and under the circumstances, we would not be warranted in disturbing the verdict on the basis that it is against the manifest weight of the evidence.

A second contention by plaintiff is that the court admitted improper evidence adduced by the defendants. The medical testimony offered by plaintiff was furnished by Dr. John F. McNamara, who testified as an expert. Plaintiff declares that "in the hypothetical question submitted to Dr. McNamara which embodied the plaintiff's theory of the case as shown by the evidence, when asked his opinion of the cause of death, he was not permitted to answer the question for

the reason that the defendant interposed objections based upon the fact that the hypothetical question did not include the findings of the deputy coroner, which said findings had not been offered nor received in evidence at that time, and which said findings were contrary to plaintiff's theory of the case. It then became necessary for the plaintiff, in order to secure an affirmative answer, upon the rulings of the Court, to embody in the question the coroner's findings which in our opinion were not essential, and the Court by its said rulings permitted the defendant to incorporate in the question evidence which was highly prejudicial to the plaintiff's case and thereby the jury was led to believe that the plaintiff admitted that the findings of the deputy coroner were true and correct.'' The record shows that at the time the hypothetical question was propounded by the plaintiff there was no dispute as to the findings of the deputy coroner, a physician. These findings were based on a post mortem examination made shortly after the death of Mrs. Peterson. Defendant insisted that the plaintiff be required to include in his hypothetical question all of the findings of the deputy coroner. Apparently, plaintiff recognized the validity of the argument of defendant because he then modified the question so as to include all of the findings. The portion of the deputy coroner's findings which plaintiff was required to incorporate in the hypothetical question required Dr. McNamara to also assume that there were no external marks of violence on the body of the hypothetical person. The record shows that it was undisputed that there were no external marks of violence on the deceased at the time of the post mortem examination. The rule is that ''where an expert witness is asked an hypothetical question and the facts are not disputed, the question must contain all the material facts or the opinion is likely to mislead the jury. Such question must not ignore material facts which affect the opinion given. While the opposite party may

cross-examine the witness he is not required so to do, as cross-examination may not remove the impression of the first answer." (*Wolczek v. Public Service Co. of Northern Illinois,* 342 Ill. 482.) "If the facts are disputed the party examining the witness may include in the hypothetical question only those facts which the evidence on his side tends to prove, but where the evidence as to the particular matter inquired into is not in dispute the question must contain all of the facts." (*Sanitary District of Chicago v. Industrial Commission,* 343 Ill. 236.) Our view is that the court did not err in requiring the plaintiff to amend his hypothetical question. The hypothetical question as propounded to the expert stated the facts according to the theory of the plaintiff and also the undisputed facts.

We turn now to a consideration of plaintiff's point that the court refused to admit proper evidence on his behalf. Mrs. Johnson who testified that not more than a half minute expired from the time she heard the noise outside of the apartment until she reached the side of Mrs. Peterson, was asked, "When you got to where Mrs. Peterson was lying, did you say anything to her and did she say anything to you?" On objection of defendant, the court refused to permit her to answer. Plaintiff then offered to show that within a half minute from the time Mrs. Johnson heard the noise, she reached the side of the deceased, and she, Mrs. Johnson, said to Mrs. Peterson, "What happened to you, Mrs. Peterson?" and that Mrs. Peterson replied, "I caught my foot on that carpet which was loose and torn." Plaintiff insists that the conversation was admissible as part of the *res gestae*. Defendant maintains that the conversation is purely hearsay. There are numerous cases defining the *res gestae* rule. Whether the circumstances under which a declaration was made are such as to make it reasonably probable that it was spontaneous, presents a preliminary question for the determination of the

trial court. The question of admissibility is one of administration, each case being properly decided upon its own facts, and in this regard the trial court should be clothed with a reasonable degree of latitude, since the application of the principle depends on the circumstances of the particular case. (*Johnson v. Swords Co.*, 286 Ill. App. 377.) Professor Wigmore advocates leaving the application of the principle of *res gestae* absolutely to the trial court's determination. Wigmore on Evidence, 3rd ed. Vol. VI, sec. 1750. Defendant points out that in the excluded answer the deceased explained not only that she caught her foot on the carpet but that the carpet was loose and torn, and that she thus indicates the narrative and deliberate quality of her reply to Mrs. Johnson. Defendant also argues that the answer of Mrs. Peterson was not spontaneous, but was elicited by the inquiry of Mrs. Johnson. We are satisfied that the trial judge, in the exercise of his discretion and with knowledge of all the circumstances, did not commit error in excluding the conversation from the jury.

Another contention of plaintiff is that the court refused to instruct the jury that "the term 'ordinary care' or 'reasonable care' as used in these instructions and applied to the plaintiff's intestate means only such care as a reasonably and ordinary careful person would exercise under the same or similar circumstances." At the request of plaintiff the court instructed the jury that "the deceased in this case was not required to exercise any extraordinary degree of care. What was required of the deceased was the exercise of ordinary care and what is ordinary care depends upon the circumstances of each particular case and is such care as an ordinarily prudent person would exercise under the same or similar circumstances." The latter instruction properly defined "ordinary care." The first or refused instruction singles out Mrs. Peterson and applies the definition of ordinary care to her alone. A jury could well be-

lieve from this instruction that "ordinary care" or "reasonable care" on the part of defendant or its agents or servants necessitated some higher or more meticulous conduct than was required by Mrs. Peterson. We are of the opinion that the "given instruction" which we have quoted, adequately defined the term "ordinary care." A more difficult question is presented by plaintiff in his insistence that the court erred in instructing the jury that "the burden of proof is not upon the defendant to show that it was not guilty of the specific negligence charged in the complaint, but the burden is upon the plaintiff to prove the defendant is guilty, and also to prove that he and his intestate were in the exercise of ordinary care for the safety of the deceased; and this rule as to the burden of proof is binding in law and must govern the jury in deciding this case. The jury have no right to disregard said rule or to adopt any other in lieu thereof, but in considering the evidence and coming to a verdict, the jury should adhere strictly to said rule." We agree with the defendant that before discussing the law applicable, we should look at the record. The instructions, of course, are given with a view to the issues before the jury, the evidence and the respective theories. The evidence shows that plaintiff and his family had lived in the premises about four years before the alleged accident. He testified that the carpet was raised from the landing about three inches and that this condition had existed for two months. Though he claims to have made three separate complaints about the carpet, only one was within two months before the accident, namely, the complaint made three or four weeks before April 27, 1936. Our Supreme Court in *Calvert v. Springfield Electric Light & Power Co.*, 231 Ill. 290, said:

"The law is well settled that an owner or occupant of land who by invitation, express or implied, induces or leads others to go upon premises for any lawful purpose is liable for injuries occasioned by the unsafe

condition of the land or its approaches, if such condition was known to him and not to them, and was negligently suffered to exist without timely notice to the public or to those who are likely to act upon such invitation.'' Hence, liability of an occupier of premises for injuries befalling an invitee is partly predicated upon an inequality of knowledge of the defect. Defendant argues that ''if a defect in the stair carpet in fact existed it is admitted that the plaintiff possessed the same knowledge of it as did the defendant and there was therefore perfect equality of notice to the plaintiff and to the defendant. It is our contention that facts showing notice to the plaintiff in cases of this character may and should be submitted to the jury under proper instructions for their finding as to whether such notice was in fact contributory negligence that bars recovery. We submit that this was one of the issues in this case and that it was proper to instruct the jury as to the pertinent law.'' In the case at bar Mrs. Peterson left her surviving her husband and a minor son. Our first impression, on reading the instructions and without having examined the authorities, was that it would be unreasonable to bar the son from recovery because of contributory negligence, if any, of the plaintiff (the father). The leading case apparently is that of *Hazel v. Hoopeston-Danville Motor Bus Co.,* 310 Ill. 38. On January 9, 1922, while it was dark, Charles Hazel was driving his automobile south on the Dixie highway. His wife, Deloia, occupied the front seat beside him. A motor bus driven by a chauffeur of defendant approached from the opposite direction. The lights on the bus were intensely bright and Charles Hazel was entirely blinded by them. He switched his lights on and off in an endeavor to cause the chauffeur of the bus to dim his lights. The lights were in his eyes about a minute. Just as Charles Hazel's car passed the bus, his (Hazel's) car crashed into a lumber wagon which was going in the same direction. The timbers which were

part of the load of the lumber wagon came through the windshield and struck his wife, killing her. Charles Hazel was appointed administrator and recovered a judgment for $8,000 against the bus company. The Appellate Court reversed the judgment with a finding of fact that ''Charles Hazel, husband of deceased, who is one of the persons for whose benefit this suit was brought, was guilty of negligence, and that such negligence contributed to bring about the accident which caused the death of Deloia Hazel, deceased.'' There were other facts and circumstances which tended to show that in driving as he did, Charles Hazel was guilty of negligence which proximately contributed to the collision with the wagon. The Supreme Court stated that ''if there is evidence tending to sustain the facts found we cannot consider its weight but are bound by the finding of the Appellate Court.'' The evidence shows that Mrs. Hazel left surviving her husband and five children, all adults. The plaintiff was the surviving husband. The court pointed out that the husband's negligence would not have any effect on the cause of action if the wife had lived. ''If she had survived the accident and had sued to recover damages for the injury the negligence of her husband in driving the automobile could not have been imputed to her and would not have barred her action. It has long been the settled law in this State that in an action to recover damages for an injury caused by negligence the negligence of a third party cannot be imputed to the plaintiff unless such third party occupies the relation of servant or agent of the plaintiff. . . . The conflict in the decisions of the courts of different States is irreconcilable, and, as we said in the consideration of this question in *Ohnesorge v. Chicago City Railway Co.*, 259 Ill. 424, if the question were an open one in this court the appellant's argument would be entitled to serious consideration.'' In many States the principle that the contributory negligence of the beneficiary is a bar to the action of the

administrator is recognized, but its effect is limited to the negligent beneficiary, and the negligence of one beneficiary which contributed to the injury will not prevent a recovery in favor of another beneficiary who was not negligent. In Ohio it is held that the administrator is a mere nominal party, having no interest in the case for himself or the estate; that the action is for the exclusive benefit of the beneficiaries; that the assessment of damages, though the verdict is for a gross sum, should be made with reference to the pecuniary injury to each separate beneficiary, and that the defense of contributory negligence is available against a beneficiary if by his negligence he contributed to the death of the deceased, but will not defeat the action as to others who are not guilty of such negligence. The statute creating a cause of action for the death of a person caused by negligence, in favor of his widow and next of kin, to be prosecuted in the name of his personal representatives, was passed in 1853. In *City of Chicago v. Major,* 18 Ill. 349, which was the first case on the subject to reach the Supreme Court, it was held that one of the objects of the statute was to create a right of action and that "the personal representative brings the action, not in right of the estate but as trustee for those who had a more or less direct pecuniary interest in the continuance of the life of the deceased, and who had some claims, at least, upon his or her natural love and affection." There the Supreme Court sustained an instruction telling the jury that the burden of proof was on the plaintiff to show not only that the city was negligent, but also that the parents were not negligent. In the *Hazel* case the court said:

"The cause of action is entirely statutory and is a single cause of action. There is no separation of the damages to be assessed by the jury. Their finding is for a single gross amount in an inseparable cause of action, and the contributory negligence of one beneficiary who may be entitled to share in the amount

recovered is a defense to the action. . . . In many cases it does not appear whether there were other next of kin than the parents, and that question does not appear to have been regarded as important. . . . A distinction is sought to be drawn between this case, in which the deceased was an adult and the negligent beneficiary a husband, and those cases in which the deceased was an infant and the negligent beneficiary a parent. There is no distinction which affects the action. The application of the rule to the case of an adult decedent is not an extension of it but merely another instance of its relevancy. The only reason for the defense in either case is the doctrine of contributory negligence.'' It will be observed that in the *Hazel* case, as in the instant case, the action was brought by a husband as administrator for the death of his wife because of alleged wrongful acts of the defendant. In the *Hazel* case the deceased left a husband and five children surviving her, and in the instant case Mrs. Peterson left a husband and one child surviving her. There is no contention in the *Hazel* case that the five children were guilty of contributory negligence. They were not present at the time of the accident. In the instant case it is not contended that the minor son of Mrs. Peterson was guilty of contributory negligence, yet, in the *Hazel* case the Supreme Court held that there is no separation of the damages to be assessed by the jury and that the contributory negligence of one beneficiary who may be entitled to share in the amount recovered, is a defense to the action. In the instant case there was competent testimony which would give the jury the right to pass on the question as to whether the plaintiff was guilty of contributory negligence which proximately caused the death of deceased. Plaintiff leans heavily on the case of *Holden v. Schley*, 355 Ill. 545. From the declaration it appears that A. T. Holden was killed in an automobile collision claimed to have been caused by the negligence of three defendants. Holden

was riding in an automobile driven by one Bettie Holden. His next of kin were Lucinda, his widow, who was appointed administratrix, and Charles, his son. Apparently Bettie, the driver of the car, would not be a distributee of the fruits of the judgment. Demurrers were interposed to the declaration upon the theory that it was defective in not alleging that the next of kin of the deceased, who would benefit by the judgment, were in the exercise of due care for the safety of the deceased at the time and place of the accident. The demurrers were sustained and after the expiration of 1 year from the death of the deceased, plaintiff amended each count by adding an allegation to the effect that the death of the deceased was not in any manner caused or contributed to by any failure to exercise reasonable care on the part of any of the beneficiaries or next of kin. The trial court held that the amendment to the declaration caused it to state a cause of action for the first time more than 1 year after the death of the deceased and sustained demurrers to it. Plaintiff abided by her declaration and carried her case to the Appellate Court, where the judgment was affirmed. The Supreme Court carefully searched all of the authorities and concluded that they did not involve questions of pleading. In speaking of the *Hazel* case, the court said:

"In that case it was held that contributory negligence of one of the persons for whose benefit the recovery is authorized is a defense to the statutory action, and this has long been the established law in Illinois, as will appear from a full review of the authorities in the case last mentioned. Many other cases will be found upon an examination of the subject, but it will be learned that in each of them the case either involves an infant, which is necessarily under the control of its parents and for which control the parents are responsible, or else it appears from the pleadings or the proof in the case that the negligence of an adult next of kin directly contributed to the death

in question. We have never held, and no case has been cited to us which has held, that in case of an adult person, who is presumed capable of caring for himself, it is necessary to allege anything more than that he himself was in the exercise of due care and caution for his own safety. . . . Proof of the facts stated in the declaration—*i.e.*, that the deceased himself and the driver of the car with whom he was riding, not being one of his next of kin, were in the exercise of due care and caution for his safety and that the accident resulted by reason of the negligence of the defendants or some of them—would have entitled the plaintiff to a verdict and judgment. . . . It is to be understood that we are expressly not passing on any question involving a child of tender years, nor upon the sufficiency of any declaration which might show on its face that some one of the next of kin participated in the transaction in question.'' It will be noted that in the *Holden* case the occupants of the car were A. T. Holden, who was killed, and Bettie Holden, who would not participate in the distribution of the proceeds of a judgment, should one be recovered. The declaration showed on its face that none of the next of kin of A. T. Holden was in the automobile at the time of the collision. A careful reading of the *Holden* case convinces us that the Supreme Court did not therein modify the rule announced in the *Hazel* case. In fact, in the *Holden* case the Supreme Court stated that ''it is to be understood that we are expressly not passing . . . upon the sufficiency of any declaration which might show on its face that some one of the next of kin participated in the transaction in question.'' It follows that the trial court was not in error in giving the instruction complained of.

Plaintiff further argues that the court gave 25 instructions in behalf of the defendants, 10 of which ended up with the language, ''then you should find the defendant not guilty.'' Plaintiff also points out that 6 of the instructions given in behalf of defendants are

based upon the question of contributory negligence, while only 8 instructions were given by the plaintiff. Plaintiff declares that the giving of these 25 instructions was calculated to impress the jury with the thought that the court was against plaintiff on the question of fact, and that they might readily be misled to believe that in the opinion of the court they should find for the defendants. No hard and fast rule can be laid down as to the number of instructions to be tendered by either party. The practice of giving an excessive number of instructions has and should be condemned. We have examined the 25 instructions given on behalf of defendants and are of the opinion that the court did not commit error in so doing.

Finally, plaintiff charges that the verdict of the jury is the result of passion and prejudice and is not based upon the true evidence in the case, and that the attorney for defendants inflamed the jury by his comments as to the character of services rendered by Dr. Hollison. An attorney is allowed a reasonable latitude to comment on the evidence. We are of the opinion that the verdict was not swayed by passion or prejudice.

For the reasons stated, the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.