**Marie Manion, Executor of the Estate of Joseph Thomas Manion, Deceased, Plaintiff-Appellee, v. Brant Oil Company, a Corporation, Defendant-Appellant.**

Gen. No. 10,805.

Fourth District.

July 5, 1967.

Rehearing denied and opinion modified September 6, 1967.

CRAVEN, P. J. dissenting.

Thomas, Mulliken & Mamer, of Champaign (Wallace M. Mulliken and Carl J. Sinder, of counsel), for appellant.

Mitchem, Hendrix & Aldeen (Charles W. Hendrix, of counsel), of Urbana, for appellee.

TRAPP, J.

Defendant appeals judgments entered upon verdicts of a jury in favor of the executor of the estate of Manion in the sum of $18,000, and in favor of his widow, individually, for medical and funeral expense in the sum of $3,445.24.

A collision occurred on February 14, 1964, when the automobile of the decedent was struck in the rear by defendant's truck. Decedent died on February 5, 1965. Prior to his death he had filed suit for injuries sustained in the collision. Following his death, the present action was filed in a count for wrongful death, and a count for the medical and funeral expenses incurred by the widow.

On the date of the collision, decedent, while driving to work at about 8:30 a. m., travelled easterly on Florida Avenue to its intersection with Race Street in Urbana, Illinois. This intersection is a four-way stop intersection. The evidence is that his car was stopped with the wheels turned as if to make a left turn on to Florida Avenue. Defendant's motor truck approached from the west, and decedent's automobile was observed standing at the intersection as the truck approached from behind for a distance of something more than one block. During this period of time no traffic was observed at the inter-

130

section of Florida and Race Street. As defendant's truck approached from the rear, slowing for the intersection, decedent's car continued to stand at the intersection and was struck by defendant's truck. Testimony is that its speed was then 3 to 5 miles an hour. Following the impact, decedent's car moved across Florida Avenue and came to rest against the curb. Defendant's driver, and a man with him, immediately went to decedent's car. Decedent stated that he needed no help, and apparently declined an offer of medical assistance. The parties exchanged identification and decedent proceeded to his office where he was employed as a petroleum technician by the Department of Revenue of the State of Illinois. Remaining a short time at his office, he complained of not feeling well and returned to his home. During the day his wife took him to see a Dr. Scott at the Christy Clinic.

A review of the medical history and the development of decedent's condition following the collision is pertinent. At the time of the collision, decedent was approximately 68 years of age; he was described by his wife and a witness employed in the same building as being in good health in the sense that he was regularly at his employment.

Following his death, an autopsy was performed and the report is in evidence. The immediate causes of death discovered include acute coronary thrombosis with congestive heart failure, pulmonary adenoma and diffuse cerebral atrophy. The autopsy set forth findings in some nine or ten categories which, as interpreted by one of the doctors, includes: (1) a heart attack, left ventricle; (2) arteriolosclerosis, hardening of the small arteries; (3) atherosclerosis of the brain with atrophy; (4) arteriolarnephrosclerosis in the kidneys; (6) kidney disease; (7) acute bronchitis; (8) damage to the spleen; (9) interstitial nephritis in the kidney tissue and (10) hypertensive cardiovascular disease and long standing damage of the adrenal glands.

It is agreed by the doctors, both for the plaintiff and the defendant, that the items found on the autopsy are degenerative diseases and that none of the conditions discovered on the autopsy, and no cause of death found, could be directly attributed to trauma.

The medical history of the decedent included surgery for hernia and a prostatectomy in the 1940's. In 1951 or 1952 he was found to have glaucoma and treatment was instituted. An examination in 1956 discloses cardiac enlargement with pulmonary congestion. In 1962 he was examined again because of the condition of his heart, and in that and the following year he was seen with regard to upper respiratory infections and heart fibrillation. The treatment for the latter condition was the use of digitalis, apparently taken regularly.

Upon examination following the collision, decedent complained of a pain in his right arm and his right chest, stating that he had hit his arm and neck. All X rays, including that of the skull, were negative. The doctor observed a bruise on decedent's arm. On the 16th of February, decedent was admitted to the hospital with a diagnosis of acute cervical muscle strain, intravertebral (sic) ligament strain and contusion of the right shoulder and arm. In addition, the diagnosis included arteriosclerotic heart disease, irregular fibrillation and congestive heart failure. Decedent exhibited confusion, but no localizing signs were found to explain disorientation. Decedent was treated for the heart failure and given medication for the muscular strain and was released on February 19th. Dr. Scott saw decedent on March 6th, at which time he was confused and suffering heart fibrillation. Later in the month decedent underwent surgery for glaucoma.

Dr. Scott made an examination in April which disclosed that decedent remained confused, had irregular fibrillation, with his heart failure under fairly good control by medication.

On June 29, 1964, decedent was again admitted to the hospital with a diagnosis of arteriosclerotic heart disease, irregular fibrillation and heart failure. He was discharged on July 20th. Decedent was seen by the doctor on January 23, 1965, because of his confusion and he was admitted to the hospital on January 30th. He was found to be markedly short of breath on exertion and while lying flat, there was fluid retention in the limbs and he was completely confused, disoriented and described as in marked cardiac failure.

We have the issue whether a causal connection exists between the collision and the death of the decedent substantially one year later. To support this proposition the plaintiff presented testimony of the opinion of Dr. Scott, a general practitioner attending the decedent, and of Dr. Bonnett, a general practitioner, testifying only upon hypothetical questions. Each doctor testified directly or upon cross-examination that the autopsy findings showed no condition of decedent that was caused by the collision, and showed no cause of death which could be directly attributable to trauma.

Dr. Scott's opinion was expressed in several places in the record. He first stated:

"I believe that his confusion and disorientation *possibly* could have been related to the accident on February 14, 1964. I believe the cardiac failure was a preexisting condition which *may have been* aggravated by the accident on February 14, 1964." (Emphasis supplied.)

At another point he said:

"I believe that the accident aggravated a previous existing condition also."

Such condition was not specified, but upon cross-examination, he said:

"I think he could have had an aggravation of pre-existing arteriolosclerosis from the accident."

Being further examined as to whether he believed the accident could actually have aggravated the arterioloscle-rosis, he answered:

"I think it is possible, far possible yes."

Describing arteriolosclerosis as hardening of the arteries and the collection of materials in the artery, he was asked how even a blow on the head would affect the collection of substances inside the blood vessels, and he replied:

"I *suppose* that it could result in a minor hemorrhage inside the blood vessel. . . . Again, *this is a presumption.*"

Neither doctor was asked in the hypothetical question, or otherwise, as to the significance, or lack thereof in the evidence in the record, of decedent's conduct in sitting or waiting at the intersection for an apparent extended or unusual period of time.

Dr. Scott cited no medical authority or experience explaining or supporting the views expressed by him, and we find no explanation or reasons for such views other than as set out in the quoted portions of the testimony. The substance of his testimony was that the principal basis for his belief that a causal connection existed was his suspicion of a subdural hematoma occasioned by trauma. Because of the condition of confusion exhibited by the decedent, he had suspected as possible causes therefor, a brain tumor, an aneurysm, or a subdural hematoma. Through tests made while decedent was being treated, he had pretty well eliminated the first two possible causes of confusion. The last cause, subdural hematoma, was eliminated through the findings of the autopsy. He agreed that it was a fair statement that the calcification and atrophy of the brain as disclosed by the autopsy, were the cause of decedent's confusion, and that such atrophy and

134

calcification of the brain were from natural causes. It will be recalled that neither upon his first examination, or his first hospitalization, was any complaint made by decedent of head injury, and no evidence of such is shown in the diagnosis in evidence.

Dr. Bonnett expressed the opinion that a causal connection existed between the death and the collision. He agreed that the primary cause of death was coronary thrombosis and that none of the several causes of death disclosed by the autopsy were directly connected with the collision; that none of the conditions found to exist could be attributed to trauma, and that no cause of death attributable to trauma was found. It appears from his testimony that he assumed an injury to the brain as:

> ". . . otherwise there would not be reason to explain confusion."

There is no testimony establishing or giving a basis for a reasonable inference of brain injury sustained in the collision. While Dr. Bonnett was not asked about any relationship between the state of confusion and the calcification and atrophy of the brain, his conclusion stated as to brain injury is contradicted by the statement of Dr. Scott that the confusion originated in brain atrophy.

Dr. Bonnett also included, as a basis of his opinion, the view that decedent was ostensibly healthy to the lay observer and that he carried on with his job. The testimony of an appearance of health to the layman would seem to be of little weight when measured by the findings of the autopsy, and we doubt that an appearance of health to a layman is the basis for a medical opinion.

In behalf of the defendant, Dr. Babowski expressed an opinion that there was no relation between the collision and the autopsy finding of causes of death. A practicing pathologist, he had reviewed the autopsy findings but had not performed it. He testified that the conditions disclosed arose from natural causes and that nothing in the

report reflected traumatic injury or conditions induced by or originating in trauma. It is his view that there is no medical explanation of the process of developing arteriosclerosis and that as a result there is no medical knowledge as to whether or not arteriosclerosis is aggravated by trauma. He expressed the view that the atrophy of the brain was the cause of the confusion.

The findings of the autopsy that the causes of death were coronary thrombosis with congestive heart failure, pulmonary adenoma, and diffusive cerebral atrophy are almost categorical that the conditions found were natural causes of death, and that nothing was found that could be attributed to trauma. This is joined with decedent's medical history of a heart ailment that had required medication over a period of years.

■ Our courts have held that there should be no recovery where there has been a failure to prove a causal connection between the injury and the event at issue. Jensen v. Elgin, J. & E. Ry. Co., 15 Ill App2d 559, 147 NE2d 204, 210; Allison v. Chicago Transit Authority, 336 Ill App 224, 83 NE2d 386.

■ Plaintiff undertakes to establish such causal connection by or through opinions expressed by Dr. Scott and Dr. Bonnett. We note the rules relevant to opinion evidence. It is said that "naked opinion" unsupported by reasons is entitled to little weight and that the weight and value of evidence expressed through opinions largely depends upon the foundations of fact and reason upon which such opinions stand. Opinion Evidence in Illinois, King & Pillinger, p 318.

■ Again, the standards in decisions of our courts are that the causal connection between the injury sustained must not be contingent, speculative or merely possible, but that there must be such degree of probability as to amount to a reasonable certainty that such causal connection exists. Lauth v. Chicago Union Traction Co.,

244 Ill 244 at 251, 91 NE 431. In Stevens v. Illinois Cent. R. Co., 306 Ill 370, 137 NE 859, two physicians examined X rays and testified that epilepsy and even death were disabilities which "might possibly result." The Supreme Court said, at p 377:

> "Mere surmise or conjecture cannot be regarded as proof of an existing fact. . . . Expert witnesses can only testify or give their opinion as to future consequences that are shown to be reasonably certain to follow."

In Kimbrough v. Chicago City Ry. Co., 272 Ill 71 at p 76, 111 NE 499, in discussing a ruling on objections to questions, the court said:

> "Expert witnesses can only testify or give their opinion as to future consequences that are shown to be reasonably certain to follow."

The court expressed the view that surmise or conjecture cannot be regarded as proof of fact, or of a future condition that will result. In Carter v. Winter, 50 Ill App2d 467, 200 NE2d 528, plaintiff's automobile was struck from behind as it was making a left turn onto a highway. Eleven days following this event plaintiff suffered a heart attack and stroke bringing on total disability. The court reversed a verdict in the amount of $100,000, because of failure to prove the causal connection between the collision and the ensuing attack. The court noted, amongst other things, that no doctor testified directly to causal connection and the most offered in behalf of the plaintiff was the opinion of a possible connection.

The testimony of Dr. Bonnett is premised upon the assumption of a blow to the head, for he states that otherwise there was no cause for the reported disorientation and confusion of the decedent. There is nothing in the record showing that decedent complained of such head injury, and no objective findings of such were made during

137

the several examinations in evidence. Opinions based upon assumed injuries not established by the weight of the evidence have been deemed totally inadequate as proof of causal connection. Carter v. Winter, 50 Ill App2d 467, 200 NE2d 528. In Shell Petroleum Corp. v. Industrial Commission, 366 Ill 642, 10 NE2d 352, the court noted that the opinion expressed in support of plaintiff's cause depended upon the existence of a brain lesion which was not in evidence. Similarly, in Wanzer & Sons, Inc. v. Industrial Commission, 380 Ill 409, 44 NE2d 40, the medical opinion as to causal connection was based upon an assumed back injury, although such injury was not in evidence. The Supreme Court reversed the award. In Peterson v. Cochran & McCluer Co., 308 Ill App 348, 31 NE2d 825, decedent suffered a head injury in a fall. His death occurred twelve days later. An autopsy showed the cause of death to be mumps. The only evidence supporting a theory of causal connection was based upon an opinion suggesting the spread of an infection from the head wound through the glands of the body. The court noted that such opinion disregarded the evidence that the wound was completely healed at the time of death as shown by the autopsy findings.

Consideration of the opinion of Dr. Scott regarding the causal connection expressed in the direct and cross-examination noted herein, does not appear to have the degree of probability which has been stated in the several opinions noted. So far as we can ascertain, such views are essentially a "naked opinion," in that they are not based upon any stated medical authority and that no physiological explanation or reasons were given for the conclusion expressed. His opinion that cardiac failure was a preexisting condition which may have been aggravated is a tentative view stated as a "naked opinion" and without any statement of a physiological basis for the opinion. See Laclede Steel Co. v. Industrial Commission, 6 Ill2d 296, 128 NE2d 718; Electro-Motive Division, Gen-

eral Motors Corp. v. Industrial Commission, 411 Ill 132, 103 NE2d 489. Testimony in a similar vein is found in Panepinto v. Morrison Hotel, Inc., 71 Ill App2d 319, 218 NE2d 880, wherein it was held that the jury should not be permitted to speculate upon such matters. Dr. Scott's opinion that there might be aggravation of the preexisting arteriosclerosis seems nullified when, upon cross-examination, he was asked to explain how even an assumed blow upon the head would affect the substances inside the blood vessels and he stated a process which he described as a presumption.

The plaintiff points out that decedent enjoyed ostensible good health prior to the collision, at least, in the sense that he was regularly employed. Such evidence has been held to be competent, but we believe that it must be considered in the light of all of the evidence in the case. In Ford v. Panhandle Eastern Pipe Line Co., 344 Ill App 566, 101 NE2d 869, plaintiff's wife testified concerning his prior good health but such testimony was held not adequate where the doctors agree that there was no causal connection between plaintiff's cerebral thrombosis and the trauma testified to, i. e., a bump on the head and a broken ankle. Again, in Shell Petroleum Corp. v. Industrial Commission, 366 Ill 642, 10 NE2d 352, twelve witnesses testified to the good health of the employee, but the medical evidence was that the trauma, a blow on the head during a robbery, was not a cause of Parkinson's disease with which the employee was afflicted. The premise of a state of good health in the decedent in this case is not borne out, either in the recorded history of cardiac impairment, nor in the objective postmortem findings of extensive degenerative diseases in many organs of the body.

Plaintiff urges that where medical evidence is conflicting, the court will not undertake to determine which opinion is more worthy of credence, but is obligated to follow

the findings of the triers of fact unless such are found contrary to the manifest weight of the evidence.

While this appeal has been under advisement, the Supreme Court has filed its opinion, Pedrick v. Peoria & Eastern R. R. Co., — Ill2d —, — NE2d —, in which it reexamines and restates the standards to be employed by trial courts in ruling upon motions for a directed verdict, or for judgment n. o. v., and similarly reconsiders the rule under which reviewing courts are authorized to determine issues of negligence or contributory negligence as a matter of law, albeit, contrary to a verdict.

In its review the Supreme Court concluded that the standards, characterized succinctly as the "any evidence" rule and the "reasonable man" rule, heretofore employed separately or in combination in the several courts were unsatisfactory in their operation and result.

It is established in Pedrick that it is the responsibility of the court to ascertain and determine whether there is, in fact, a substantial factual dispute which calls for resolution by a jury. The judicial role operates from two fundamental propositions: (1) it is a constitutional right of the parties to have substantial factual disputes resolved by a jury, and (2) in determining whether such substantial factual dispute exists the court considers all of the evidence in its aspect most favorable to the party against whom the court is called upon to rule.

It is established for a court of review that where verdicts are not factually sustainable, there is no real reason to remand for a new trial in the absence of some probability that new or different evidence would be available upon a subsequent trial. This appeal includes the issues as to whether or not the trial court erred in denying the defendant's motions for directed verdict and for a judgment n. o. v., and in this court it is urged that the verdicts are contrary to the manifest weight of the evidence in that the negligence complained of was not the proximate cause of death.

140

■ Considering all of the evidence in the light of the rule of Pedrick, we conclude that the verdict of the jury is not factually sustainable in that the plaintiff failed to prove the element of causal connection between the collision in evidence and the death of Manion. It may be said that the medical opinion offered in proof of such issue appears to be based upon an inference that traumatic injuries were, in fact, sustained, which in turn, gives rise to an inference that decedent's death resulted from non-traumatic causes aggravated by the traumatic injury inferred. Upon such a basis an opinion was expressed which, by the standards of evidence considered, has but little probative value. A medical opinion of causal connection is essentially meaningful for a jury or court only when founded upon recognized medical authority or experience, or when there has been persuasive explanation of physiological processes establishing a reason for the opinion.

In contrast, each doctor testifying agreed that the autopsy, unchallenged in its detail or scope, demonstrated that the several causes of death disclosed were natural and progressive, and that there was no evidence discovered of any traumatic aggravation of such preexisting natural conditions. Within the standards of Pedrick, such evidence overwhelmingly favors the defendant upon the issue of causal connection.

It appearing upon Petition for Rehearing that there are, or may be, damages and expenses incurred by the plaintiff, Marie Manion, Individually, under Count II of the Complaint, which are the direct and proximate result of the collision at issue, the Order of this Court upon the appeal is modified as follows:

> The judgment entered in the trial court in favor of Marie Manion, Executor of the estate of Joseph Thomas Manion, deceased, is reversed.
>
> The judgment entered in favor of Marie Manion, Individually, is reversed and the cause is remanded

for a new trial for the sole purpose of ascertaining such expenses incurred and paid by the said plaintiff, which are the proximate and direct result of the collision at issue.

Reversed and remanded in part.

SMITH, J., concurs.

CRAVEN, P. J., dissents.

CRAVEN, P. J., dissenting:
The verdicts in this case are supported by opinion evidence from the treating physician and from a general practitioner testifying in response to hypothetical questions. Both expressed the view that there was a causal connection, to a reasonable degree of medical certainty, between the trauma of the accident of February 14, 1964, and the ultimate death of Joseph Manion on February 5, 1965. This medical opinion evidence was based upon the course of the decedent's physical health following treatments begun two days after the accident, as well as upon the factors discussed in the majority opinion, and upon the medical belief that the accident might have caused an aggravation of certain of the degenerative processes present in the decedent's body as shown by the autopsy and the testimony of the pathologist based upon the autopsy performed by another. The opinion evidence, as such, cannot be faulted in this case, for that evidence is couched in language and terms that reviewing courts in Illinois have accepted as evidence. See Clifford-Jacobs Forging Co. v. Industrial Commission, 19 Ill2d 236, 166 NE2d 582; Smith v. Illinois Valley Ice Cream Co., 20 Ill App2d 312, 156 NE2d 361.

The majority opinion equates these expressions of medical opinion with an absence of evidence and character-

izes them as a "naked opinion," concluding that they are devoid of any foundation. I agree that the foundation for these ultimate opinions has been badly fractured by the findings of the autopsy report and the other items discussed in the majority opinion. Indeed, I might even agree that the foundation is so weakened as not to be sufficient to sustain the verdicts which the jury rendered. Accordingly, as I view the record, remandment for a new trial is the proper disposition of this case.

The recent opinion of the Supreme Court in Pedrick effects a substantial change in a vital area of Illinois law. It is a far-reaching change but the new rules as expressed in Pedrick have not been properly applied to this case as I view this record and the expressions in Pedrick.

There is some factual residual basis for the doctors' opinions and there is no showing that additional evidence could not be developed which would cure the defect in the present foundation testimony on which these opinions are based. The real problem in this case is that the verdicts are against the manifest weight of the evidence. My colleagues employ a doctrine in this case which should be employed only when there is no substantial factual dispute between the parties and when a remandment for a new trial would be an empty judicial gesture. Pedrick leaves in full force and undisturbed the former rule that a verdict against the manifest weight of the evidence should be set aside and a new trial granted. The Supreme Court, in Pedrick, stated:

> "We have rather carefully preserved the distinction between the evidentiary situation which will require a new trial (verdict against the manifest weight of the evidence Lau v. West Towns Bus Co., 16 Ill2d 442, 451, cert den 361 US 127) and that justifying direction of a verdict or judgment n. o. v. There is,

in our judgment, excellent reason for so differentiating to be found, in the radically different results of allowance of the two motions, and we believe a more nearly conclusive evidentiary situation ought to be required before a verdict is directed than is necessary to justify a new trial. It is not our intention by this opinion to alter this concept. . . ."

In a case strikingly similar to the instant case, the weakening of the foundation for the doctors' opinions on causation was held to require a new trial. In Butler v. Palm, 36 Ill App2d 351, 184 NE2d 633, the court considered a doctor's testimony that plaintiff's meningoencephalitis could be causally related to injury. The doctor had based his testimony on the assumption that the brain or spinal cord had been injured. There was no evidentiary basis for that assumption. It was held that the evidence should not have been admitted but the case was remanded for a new trial.

It cannot be said, in this case, that all of the evidence, viewed most favorably to the plaintiff, so overwhelmingly favors the defendant that no contrary verdict based on this evidence *could ever stand.* This record involves an evidentiary situation which requires a new trial, and I would remand for that purpose.