WEIL-KALTER MANUFACTURING COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(WILLIAM H. ROBISON, Defendant in Error.)

*Opinion filed February 14, 1941—Rehearing denied April 2, 1941.*

W. C. ROPIEQUET, for plaintiff in error.

BEASLEY & ZULLEY, for defendant in error.

Mr. JUSTICE WILSON delivered the opinion of the court:

William H. Robison filed an application for the adjustment of compensation with the Industrial Commission charging that Margaret Robison, his wife, suffered an accidental injury while she was employed by the Weil-Kalter Manufacturing Company, and that the injury resulted in Mrs. Robison's death. The arbitrator found that the employee had sustained an accidental injury arising out of and in the course of her employment but denied compensation on the ground that the evidence failed to disclose a causal relation between the injury and death. The Industrial Commission, on review, set aside the decision of the arbitrator, found that Margaret Robison's death resulted from the accidental injury, that her average weekly wage was $12 during the year next preceding the injury, and that her husband was dependent upon her earnings. Accordingly, the commission awarded the applicant $2500 as compensation conformably to section 7(b) of the Workmen's Compensation act. (Ill. Rev. Stat. 1939, chap. 48, par. 172. 7.) March 4, 1940, the circuit court confirmed the decision of the commission. We have granted a writ of error for a further review.

Uncontroverted testimony discloses that Margaret Robison, fifty-five years of age, had been employed as a janitress in the factory of the Weil-Kalter Manufacturing

Company, the plaintiff in error, located at Sparta, five or six years prior to August 31, 1934, and for the preceding two years she had worked under the immediate supervision of Ulala Bixby. About noon on the day named, while pursuing her regular duties, she stumbled on a worn and rough place in the floor of the factory. The forewoman, Ulala Bixby, observed that Mrs. Robison was not limping around 8:00 or 9:00 o'clock in the morning, testifying that she first saw her limping a little before noon and that the employee continued to limp the balance of the day. From the forewoman's testimony it also appears that Mrs. Robison, on August 31, told her superior that she had turned and sprained her ankle. Sigmond Tietge, a fellow-employee, who took Mrs. Robison in his automobile from the factory to the office of Dr. C. O. Boynton in the afternoon, testified that she was limping as she moved from the factory to his car. Dr. Boynton was not available and Tietge took Mrs. Robison home, arriving about 4:30 P.M. Her husband, the defendant in error, assisted her into the house. Dr. N. F. Roberson, who, in the absence of Dr. Boynton, rendered first aid to Mrs. Robison, testified to an injury of recent origin to her right ankle. An accident report of the employer on the form prescribed by the Industrial Commission described an accidental injury, namely, a sprained ankle, to Margaret Robison, August 31, 1934, at 11:30 A.M. while in the employ of the plaintiff in error at its Sparta plant. The evidence narrated is sufficient to sustain the successive findings of the arbitrator, the Industrial Commission and the circuit court that the employee sustained an accidental injury arising out of and in the course of her employment.

Disposition of plaintiff in error's contention that the defendant in error did not prove a causal connection between the accidental injury and the death of his wife requires a review of the relevant testimony. According to

the defendant in error, Mrs. Robison was in good health when she departed for work on the morning of August 31, there being "nothing wrong with the woman at all," and, in particular, her right shoulder and right side were all right and she was not limping in any way. He also said that since the birth of their ninth child, twenty years earlier, his wife had been "like a little mule and she  *  *  * never had a day's illness in her life outside of her confinement." The defendant in error testified that while his wife was resting at their home prior to Dr. Roberson's arrival she vomited little streaks of blood, that she vomited during Dr. Boynton's visits on September 1 and 3, and, in fact, constantly and with increasing severity from August 31 to the day of her death, two weeks later on September 14. He testified, further, that when Dr. Roberson examined his wife's right foot it was discolored up to the ankle, being almost as black as his shoe. Again, the next day, he saw her foot and it was black and swollen. A week later, on September 8, he saw a bruised "blacky-blue" mark on the right side a little toward the front above the pelvic bone. He also stated that she complained of her right side from the day of the accident until the day of her death. It appears further, from his testimony, that Mrs. Robison was able to be out of bed on only two occasions, and then, assistance was required.

George Robison, a son, twenty-one years of age, testified that there was nothing wrong with his mother's health during her employment with the plaintiff in error. He was at home during the month of August and noted that his mother was able to attend her usual household duties. When he saw her on the davenport on the late afternoon of August 31, she had a yellowish look on her face and her right ankle was considerably swollen. The son was present when Dr. Boynton removed the bandage September 1, and saw that the ankle was swollen and blue. George stated

that several days after his mother had been brought home he observed that her right arm was blue, a condition which remained quite a while.

Marie Misselhorn, a neighbor, who assisted with the care of Mrs. Robison during her illness, knew of no ailment suffered by the latter prior to August 31. On her first visit, the evening of August 31, the witness noticed only the bandaged foot. She testified that Mrs. Robison made a complaint about her right side the second day she was present, and that on the second day after August 31, and again, about three days before her death, she saw black and blue spots on Mrs. Robison's right side around the waistline. Mrs. Misselhorn observed that Mrs. Robison had a yellowish color, also blue spots running down her right arm and during her attendance witnessed vomiting spells. The latter's condition, the witness added, became worse from September 8, and she was unable to get out of bed by herself.

Dr. Roberson testified that during the half-hour he was present on the afternoon of August 31, Mrs. Robison was not nauseated. Dr. Boynton, a witness in behalf of the plaintiff in error, visited Mrs. Robison the first time in the morning of September 1, responding to a call from her employer. He testified that the patient was then vomiting bile and complained of severe pain in her upper abdomen. He relieved the pain with hypodermic medication and examined the patient. From his testimony it appears that he found the ankle to be slightly swollen, with no heat, no discoloration and no redness, merely a little swelling on the ankle. His diagnosis was that the patient had probably turned her ankle and had wrenched or strained the ligaments. Testifying further, Dr. Boynton stated that no tumor masses were found except in the right inguinal region where there appeared to be a group of enlarged glands, hard and nodular, irregular in size, and, from the type of the mass, it was his opinion they had been present

a long time. He did not reach a definite diagnosis stating that the mass suggested itself as being a malignant type of growth. Dr. Boynton strapped and bandaged the ankle and gave the patient some medicine. He next visited Mrs. Robison two days later, on September 3, when he examined the ankle which appeared to have improved. On this visit, he found the patient very sick although the pain had not been so severe. He stated that he did not then find any black marks on the ankle and continued the first treatment. He testified that on the occasion of his third and last visit on September 7, Mrs. Robison stated she was feeling better and was able to walk a little. He made a cursory examination, limited to taking the pulse, temperature, examining the ankle and reducing it. The ankle, he said, appeared to be practically all right and he concluded that his services, so far as the ankle was concerned, were no longer required. He stated that his examination disclosed no marks, discolorations, or bruises on the body of any kind other than the swelling of the ankle, and added that she made no complaints to him with respect to her right side. He did not visit Mrs. Robison during the last week of her illness. In his sworn statement to the coroner Dr. Boynton said that he did not know the cause of death. To the question whether the fall aggravated some pre-existing condition or itself produced death, Dr. Boynton replied he could not tell and to the same question at the hearing before the arbitrator replied: "I prefer to answer I don't know." He also reported to the coroner: "As best I can determine I consider that the death has no connection with any accident, the illness was coincident rather than the result of an accident." Dr. Boynton declined to testify before the arbitrator directly as to the cause of death, expressing the opinion merely that Mrs. Robison died of "metastasis of cancer," probably from the stomach, adding that the persistent vomiting of a dark substance is always suggestive of malignancy involving the

stomach. He stated further that he did not think there was any connection between the injury Mrs. Robison received and her death. On cross-examination, he stated that he had suspected cancer of the stomach from the be-. ginning, his suspicion having been aroused by the patient's condition and sallow complexion which he had observed for several years. He added that lumps in the inguinal region are frequently caused by falls; that he gave Mrs. Robison an arsenical preparation and anti-acid as treatment for the growth, and that he observed no change in this condition on September 7, concluding, that he did not recall reporting it to anybody, "I didn't want to get into a controversy."

Ulala Bixby testified that she had heard Mrs. Robison complain of her stomach several times prior to August 31, 1934, the first complaint having been made a month or two before the day she was hurt. Miss Bixby admitted, however, that the employee had never lost a day from her work while the factory was operating.

The evidence demonstrates that prior to August 31, Margaret Robison was in good health, reporting regularly for work at the plaintiff in error's factory, rarely, if ever, absent from her employment, and, in addition, supervising a household consisting of herself, her husband, and two unemployed adult children, George and Caroline. On the day named, she sustained an accidental injury arising out of and in the course of her employment, requiring assistance in returning to her home. Admittedly, her ankle was badly swollen and there is evidence to the effect that on the next day, and thereafter, her right side and arm were discolored, and that she was confined to her bed until the day she died. Dr. Boynton's testimony discloses that he found a lump in her side and, in addition, there is the testimony of the defendant in error, the son and Mrs. Misselhorn, that she had black and blue marks on her body. The record shows that Mrs. Robison suffered intense pain, commencing with the day of her injury and continuing

fourteen days to the day of her death. Dr. Boynton's testimony to the effect that he thought Mrs. Robison had cancer is impaired by his testimony that he saw no change in this condition on his third and last visit to her on September 7; that he reported this condition to no one and had never even mentioned its existence prior to the hearing. The unalterable fact that during the seven days between Dr. Boynton's last visit and his patient's death she grew steadily worse, tends to corroborate the witnesses' testimony in behalf of the defendant in error concerning her good physical condition prior to the date of her injury and her impaired condition subsequent thereto, and to refute Dr. Boynton's medical testimony in behalf of the plaintiff in error. Proof of a decedent's perfect health prior to an injury, and of a change occurring immediately afterwards and continuing until death, is competent to establish that the subsequent condition resulted from the injury. (*Macon County Coal Co.* v. *Industrial Com.* 374 Ill. 219; *Plano Foundry Co.* v. *Industrial Com.* 356 id. 186; *Consolidated Coal Co.* v. *Industrial Com.* 320 id. 171.) The Industrial Commission, qualified by experience and special study to draw reasonable conclusions and inferences from evidentiary facts in workmen's compensation proceedings, has found, as a question of fact, that Margaret Robison's death resulted from her accidental injury, and the commission's finding has been approved by the circuit court. There is sufficient evidence to sustain the decision of the commission, and where the evidence is merely conflicting, as here, and not contrary to the manifest weight of the evidence, its decision will not be disturbed. *Garbowicz* v. *Industrial Com.* 373 Ill. 268; *Chicago Park District* v. *Industrial Com.* 372 id. 428; *Board of Education* v. *Industrial Com.* 362 id. 263; *Chicago and Illinois Midland Railway Co.* v. *Industrial Com.* id. 257.

The remaining contention of the plaintiff in error is that the defendant in error was not totally dependent upon the earnings of his wife, within the meaning of section

7(b) of the Workmen's Compensation act. Paragraph (a) of section 7 prescribes the amount of compensation to be paid to a widow, child or children whom a deceased employee was under legal obligation to support at the time of his injury. Paragraph (b) of section 7, (Ill. Rev. Stat. 1939, chap. 48, par. 172. 7, p. 1589), so far as is pertinent, provides: "If no amount is payable under paragraph (a) of this section and the employee leaves any parent, husband, child or children who at the time of disablement were totally dependent upon the earnings of the employee, then a sum equal to four times the average annual earnings of the employee, but not less in any event than two thousand five hundred dollars, and not more in any event than four thousand dollars." Paragraph (c) authorizes awards to partially dependent parents or children. Similarly, paragraph (d) provides for the payment of compensation to grandparents, grandchildren or collateral heirs who were dependent at the time of the injury to the employee upon his earnings to the extent of fifty per centum or more of total dependency. The law does not recognize partial dependency where the deceased employee leaves a widow whom he was legally obligated to support at the time of his injury nor does it recognize partial dependency where the deceased employee leaves a husband totally dependent upon the earnings of the employee. In short, a dependent husband, so far as the law ordains, stands in the same position as a wife whom a deceased employee was under legal obligation to support.

The defendant in error testified that he was more than sixty years of age, and that two unmarried, unemployed children were living with him at the time of his wife's death; that for twenty-six years he had been afflicted with miner's asthma, and that during the last eight years he had not worked at all, his last employment having been with a department store in St. Louis as an inspector, taking packages to different parts of the building. Accord-

ing to his testimony, Margaret Robison supported him during the last eight years of her life. During the three years preceding the injury it appears that defendant in error and his wife received $10 a month as rent from a small property in Sparta. From the testimony of defendant in error and his son George it also appears that some years, as in 1934, he cultivated a garden of about two acres, and in previous years had sold produce from the garden. At the time of the hearing he was no longer able to cultivate this plot and was, instead, cultivating a small garden plot about sixteen feet by thirty feet where he raised some of the vegetables used by his family. There is also testimony to the effect that for ten of the twelve months immediately preceding his wife's death, the defendant in error received $25 per month from the United States as payment for his son George's service in a "C.C.C." camp. George's service had terminated and he was living at home with his parents at the time his mother was injured.

Familiar principles are applicable to the facts. Dependency, as the term is employed in the statute, implies a present existing relation between two persons, where one is sustained by another or looks to or relies on the aid of another for support or for reasonable necessaries consistent with the dependent's position in life. (*France Stone Co.* v. *Industrial Com.* 369 Ill. 238; *Bauer & Black* v. *Industrial Com.* 322 id. 165.) It is, of course, not fatal to defendant in error's claim that he is dependent, even though it appears that he does have other means of partial support. (*France Stone Co.* v. *Industrial Com. supra.*) The decisive test is whether the contributions were relied upon by the applicant for his means of living, judging by his position in life, and whether he was to a substantial degree supported by the employee at the time of the latter's death. (*Bauer & Black* v. *Industrial Com. supra.*) This court does not interfere with the finding of the commission on fact questions as to the existence and extent of

dependency, if there is evidence to sustain the finding. *France Stone Co.* v. *Industrial Com. supra; General Construction Co.* v. *Industrial Com.* 314 Ill. 58.

It does not appear that this court has had occasion to consider the claim of a husband dependent on his wife's earnings. The law authorizes compensation in such cases, however, and we are not warranted, under the cloak of construction, in frittering away the right to an award if a husband was, in fact, dependent upon his wife. The Workmen's Compensation act, especially in determining questions of dependency, should receive a practical and liberal construction. (*Waechter* v. *Industrial Com.* 367 Ill. 256; *LaSalle County Carbon Coal Co.* v. *Industrial Com.* 356 id. 421.) In the case at bar the evidence discloses that the defendant in error had long been dependent upon his wife's earnings. The statute does not deny compensation to a surviving husband merely because he may only be partially dependent rather than totally dependent upon his wife. Manifestly, the facts recounted would not bar a wife's claim as a dependent under paragraph (a) of section 7. It follows necessarily that they do not preclude a husband from invoking the ameliorative provisions of paragraph (b) of section 7. The evidence here amply supports the decision of the Industrial Commission that defendant in error was, in fact, dependent upon Margaret Robison's earnings within the contemplation of section 7(b) of the Workmen's Compensation act, and he is entitled to the minimum award of compensation made to him.

Plaintiff in error places reliance, however, on *Chicago, Wilmington and Franklin Coal Co.* v. *Industrial Com.* 329 Ill. 494, *Neenan* v. *Industrial Com.* id. 48, *Pope* v. *Industrial Com.* 305 id. 562, *Superior Coal Co.* v. *Industrial Com.* 304 id. 320, and *Keller* v. *Industrial Com.* 291 id. 314, to sustain its contention that the defendant in error was not totally dependent upon his wife. In four of these cases, mothers claimed to be totally dependent upon their sons

and in one (*Superior Coal Co.* v. *Industrial Com. supra*) a granddaughter claimed to be a dependent of her grandfather. An award of partial dependency, or the minimum statutory award, was made in each instance. Paragraph (c) authorizes such awards to parents and to grandchildren. On the other hand, paragraph (b) makes no provision for awards to partially dependent husbands. The cases relied upon, not being parallel upon the facts and controlled by different provisions of the statute, are inapplicable in the present case.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*