(No. 32081.—

ELECTRO-MOTIVE DIVISION, GENERAL MOTORS CORPORATION, Defendant in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(GEORGIANA STAFFORD, Plaintiff in Error.)

*Opinion filed January 24, 1952.*

GEORGE D. HILLSTROM, and O'NEILL & MACKIE, both of Chicago, (THOMAS B. MACKIE, of counsel,) for plaintiff in error.

POPE & BALLARD, of Chicago, (LEWIS J. WEST, of counsel,) for defendant in error.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

Georgiana Stafford filed with the Industrial Commission an application for adjustment of claim against Electro-Motive Division, General Motors Corporation, charging that on August 21, 1946, her husband, John E. Stafford, suffered an accidental injury arising out of and in the course of his employment, and that the injury resulted in his death on July 15, 1947. An arbitrator awarded compensation benefits, and upon review the Industrial Commission sustained the arbitrator's award. The superior court of Cook County set aside the decision and award of the commission. We have granted a writ of error for a further review.

On August 21, 1946, Stafford, then sixty years of age and employed by the Electro-Motive Division of General Motors Corporation, suffered a diagonal laceration about

two inches long on the palmar surface of his left index finger. The cut was caused by a piece of broken glass on his workbench. Stafford reported immediately to the plant nurse who first cleansed the cut with a green soap solution, next applied hydrogen peroxide and tincture of mercresin, both antiseptics, bridged the cut, suturing being deemed unnecessary, and then bandaged the hand. On each of the next three days, the nurse redressed and bandaged the cut and applied the same antiseptics. A skin condition or reaction on the palmar surface of the left hand, on the left wrist under the bandage, and in the webs of the hand, developed between August 21, the date of the injury, and August 24. Blisters and redness gave the inflamed area an appearance comparable to poison ivy. The condition progressed and, by September 2, the skin surrounding the blisters had become angry and red, the blisters were breaking open and "weeping," and the condition had spread up the left forearm. Not only was there a more marked redness on his hands but the condition spread to his arms and face, resulting in a swelling and puffiness about the eyes and a scaling appearance on his face. On or about September 2, Dr. Theodore H. Gasteyer, the family physician, examined Stafford and prescribed for the skin ailment. At that time, Dr. Gasteyer saw Stafford on at least two occasions. His diagnosis was generalized eczematoid dermatitis (inflammation of the skin) which appeared on the patient's injured side first and spread to the uninjured side as it progressed. Being dissatisfied with the patient's condition, Dr. Gasteyer referred him to Dr. Michael E. Ebert, a physician specializing in dermatology. Dr. Ebert examined Stafford on September 4 and diagnosed his condition as a severe case of dermatitis venenata, which means outside contact dermatitis, also commonly called eczema, indicating that it was caused by something contacted, plus a moderate amount of toxic dermatitis. Dr. Ebert testified that Stafford told him antiseptics were applied by the plant

nurse "and from that time on or shortly thereafter he began to get this reaction that he showed me." The physician explained that, in referring to eczema, skin specialists are ususally referring to a chronic dermatitis, and that, in his opinion, it is generally preceded by an acute dermatitis due to some contact, or irritant, such as soap, cleansers, or something of that nature, followed by a general sensitization of the skin which renders one very susceptible to future attacks. Dr. Ebert testified further that conditions which would cause dermatitis were contacts with any number of substances, those which would irritate anyone, such as lye or hydrochloric acid, and others which do not irritate generally but occasionally irritate a sensitive individual. He stated that not infrequently, following exposure to something to which a person is very sensitive or to some agent which may irritate everyone, "the area that was exposed becomes inflamed and then other parts of the body become sensitive, and whether it is a protein or what it is, it has never been exactly determined, but it will produce reddening as well as swelling and usually itching in other parts of the body, and then we call that a toxic dermatitis, and it is not at all uncommon in acute cases."

A course of treatment for the disease was commenced. On September 5, when Stafford went to the plant dispensary, the nurse observed dermatitis on the arm and under the dressing on the wrist. Dr. Ebert treated Stafford eight times in September, five times in October, twice in November, and once in December, 1946, twice in January, February, and March, 1947, once in April and May, and four times in June. In the meantime, the condition had cleared up to such an extent that Stafford returned to work on November 19, 1946.

The employer paid $234 to Stafford as workmen's compensation benefits during the time he was incapacitated. Illustrative remittance advices of the employer for $18 each bear the following notations: October 15, 1946, "Com-

pensation for one week 10-2-46 to 10-9-46 a/c deep lacera-
tion left palm resulting in dermatitis;" October 21, 1946,
"Compensation for one week 10-9-46 to 10-16-46 a/c der-
matitis, result accident 8-21-46;" October 25, 1946, "Com-
pensation for one week 10-16-46 to 10-23-46 a/c dermatitis,
result of allergy to medicines. Accidental injury 8-21-46
cut on palm of hand;" October 29, 1946, "Compensation
for one week 10-23-46 to 10-30-46 a/c accident to hand
resulting in dermatitis 8-21-46," and November 20, 1946,
"Compensation for one week 11-13-46 to 11-20-46 a/c
laceration to left palm resulting in dermatitis."

Stafford continued to work for his employer from the
date of his return to and including May, 1947. During this
entire period, the dermatitis, although at times relatively
static, persisted, manifesting itself in "patches" or "relics,"
described as small, scaly, slightly thickened patches. His
skin developed a thin parchment-like appearance. Although
Stafford improved and most of the sores had healed by
January and February, 1947, the dermatitis never com-
pletely disappeared, and outbreaks occurred every week or
two. As these new places on the skin responded to treat-
ment and healed, others appeared.

According to Dr. Ebert, a patient who has suffered a
severe dermatitis venenata develops a hypersensitivity and
thereafter is much more likely to have subsequent attacks;
the dermatitis here was toxic in nature, and it recurred
severely on at least two occasions. In this case, Stafford
had a severe recurrence on his face on February 10, 1947,
with inflammation, or a conjunctivitis, of the eyes. On
June 11, there was an extreme acute flareup on his face and
the genital region. After this last recurrence the disease
again spread rapidly to the arms and legs, with swelling of
the legs. This condition did not respond to treatment.
Acute nephritis of two weeks' duration following by acute
uremia of ten days' duration developed, and Stanfford died
on July 15, 1947.

Dr. Gasteyer, who attended Stafford in his last illness, testified there is a relation between uremia and nephritis, and that nephritis usually appears first in the cycle, the interval between the two depending upon the acuteness or severity of the condition. In this case, the nephritis followed from the long siege of dermatitis, the debilitating nature of the disease gradually weakening Stafford. The cause of nephritis,—the kidney involvement,—according to the physician, are infection, drugs, poisons and, possibly, faulty metabolism. He stated that a faulty metabolism results from the same causes as allergic reactions and, in particular, that the disease process can itself cause faulty metabolism. He testified that acute uremia can be caused by the absorption of poisons, either from within or without the body, which might injure the kidney tissues, and included in the poisons from within the body there could be the absorption of products which occurs during a severe generalized eczema. The fact that Stafford was not hospitalized rendered it impossible to give the tests required to determine the type of poison and infection causing his uremic condition. Upon cross-examination, Dr. Gasteyer testified that he never determined the type of infection or poison which caused the dermatitis he diagnosed and treated.

The only witness who testified for the employer was Dr. William D. Tillson, who merely said that the antiseptics applied were suitable products approved by United States Pharmacopoeia.

In the present case, the injury to Stafford's finger admittedly arose out of, and in the course of, his employment. The only controverted issue decided by the Industrial Commission was that there was a causal relation between the injury on August 21, 1946, and Stafford's death on July 15, 1947. The question here is whether that decision of the commission was manifestly against the weight of the evidence.

The evidence shows that on and prior to August 21, 1946, Stafford was in good health. This fact was confirmed by two physical examinations made on behalf of his employer during the preceding year, one on September 17, 1945, the other on July 23, 1946, only twenty-three days before the injury. Stafford was in good health on the days named and was not afflicted with any skin disease. Although the accidental injury itself was relatively minor in nature, inflammation of the skin known as dermatitis venenata developed within two or three days after the cut on Stafford's finger. Thereafter the dermatitis never subsided completely. Even when his condition improved intermittently, patches or relics of dermatitis were always present. There were severe recurrences after the employee returned to work, and the disease became violent in June, 1947. From this point on, the patient's condition deteriorated rapidly and first nephritis, and then uremia, appeared. Proof of a decedent's perfect health prior to an injury, and of a change occurring immediately thereafter which continued, as here, until death, is competent to establish that the death resulted from the injury. *Weil-Kalter Mfg. Co.* v. *Industrial Com.* 376 Ill. 48; *Macon County Coal Co.* v. *Industrial Com.* 374 Ill. 219; *Plano Foundry Co.* v. *Industrial Com.* 356 Ill. 186; *American Mutual Liability Ins. Co.* v. *Industrial Com.* 342 Ill. 605.

The employer insists that the cut on Stafford's finger had no causal relation to the dermatitis. Stafford went to the employer's plant nurse immediately after the cut was sustained, she cleansed it, and the sequence of afflictions commenced which culminated in his death approximately eleven months later. The skin condition flared up after the application of antiseptics by the nurse between the day of the injury and the third day after it. It is true, of course, as the employer points out, that the medication used was a recognized standard treatment. The fact remains, however, that the skin disease began to manifest itself almost imme-

diately after application of the tincture of mercresin and hydrogen peroxide. Following the initial accident, the skin disease developed, became static at times but never wholly quiescent, and thereafter, when the dermatitis reached its most violent stage, nephritis and uremia followed. It was the cut on Stafford's finger which started the chain of events eventually resulting in death. Competent medical testimony is to the effect that the skin disease was the same disease at all times, to and including the last acute attack of dermatitis venenata preceding the onset of nephritis. Admittedly, the nephritis and the uremia which followed did not result directly from the cut on Stafford's finger. The evidence is clear, however, that these two diseases did result from the weakened condition of the employee caused by the ravages of a severe case of dermatitis. The really important link in the chain is the causal relationship between the dermatitis and the laceration. Although a skin disease, such as eczema, may itself be an accidental injury, within the contemplation of the Workmen's Compensation Act, (*Peru Plow and Wheel Co.* v. *Industrial Com.* 311 Ill. 216,) the question here is the causal relationship between the cut sustained on August 21, 1946, and the dermatitis, not whether the dermatitis itself was an injury. The Industrial Commission could have found from the evidence, as it did, that a causal relationship obtained between the cut and the subsequent dermatitis and, in addition, that the dermatitis was causally related to the nephritis and uremia, the immediate causes of death. The commission may well have drawn the reasonable inference that the skin disease arose from the application of the antiseptics, particularly since the employer did not offer any evidence to the effect that dermatitis did not develop or could not have developed from them.

At a time close to the original injury, and when very serious consequences were not anticipated, the employer recognized that the cut caused the dermatitis. It made pay-

ments of compensation to Stafford in September, October and November, 1946, for benefits for thirteen weeks, and sent seven "remittance advices" to him which expressly stated in varying words that the particular payment represented compensation for one week on account of dermatitis resulting from an accidental injury to his left palm on August 21, 1946. These statements go beyond mere proof of payment of compensation; they are admissions of the employer, over a period of time, that the skin disease of dermatitis venenata, from which Stafford was suffering, resulted directly from the cut on his finger.

The employer directs our attention to the death certificate prepared by Dr. Gasteyer, which states that the immediate cause of death was acute uremia lasting ten days, due to acute nephritis of two weeks' duration and generalized eczematoid dermatitis of nine months' duration. The fact that Dr. Gasteyer answered in the negative the question on the certificate, "Was disease in any way related to occupation of deceased," does not aid the employer. The issue in this proceeding is whether the disease was related to the injury sustained on August 21, 1946, rather than to his occupation.

The court has frequently stated that it is the province of the Industrial Commission to draw reasonable conclusions from evidentiary facts in workmen's compensation proceedings, and that the courts will not set aside a decision of the commission upon a finding of fact unless manifestly against the weight of the evidence. (*Wilhelm* v. *Industrial Com.* 399 Ill. 80; *Weil-Kalter Mfg. Co.* v. *Industrial Com.* 376 Ill. 48; *J. I. Case Co.* v. *Industrial Com.* 378 Ill. 132.) Where different inferences may be reasonably drawn from undisputed or established facts, the commission alone is empowered to draw the inferences and its decision as to the weight of the evidence will not be set aside upon review. (*Town of Cicero* v. *Industrial Com.* 404 Ill. 487; *Lawrence* v. *Industrial Com.* 391 Ill. 80; *Rosenfield* v. *In-*

*dustrial Com.* 374 Ill. 176.) Upon the record made, the evidence is sufficient to sustain the decision of the commission, and it should not have been disturbed.

The judgment of the superior court of Cook County is reversed and the decision of the Industrial Commission confirmed.

*Judgment reversed; award confirmed.*