(No. 33553.—

ILLINOIS STATE BANK OF QUINCY, Defendant in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(HATTIE HINSHIDE, Plaintiff in Error.)

*Opinion filed September 23, 1955.*

SAM FRIEDMAN, and CHARLES E. BINKERT, both of Quincy, for plaintiff in error.

SCHMIEDESKAMP & JENKINS, of Quincy, (JOHN T. ROBERTSON, of counsel,) for defendant in error.

Mr. JUSTICE DAILY delivered the opinion of the court:

Hattie Hinshide, plaintiff in error, filed an application for adjustment of claim with the Industrial Commission charging that Russell Hinshide, her husband, suffered an accidental injury which resulted in his death while employed by Illinois State Bank of Quincy, the defendant in error. An arbitrator for the commission found that Hinshide had sustained an accidental injury arising out of and in the course of his employment which caused his death and awarded compensation to plaintiff in error. On review, at which time additional evidence was heard, the commission sustained and affirmed the finding of the arbitrator. Thereafter, however, on *certiorari,* the circuit court of Adams County reversed the decision of the commission as being against the manifest weight of the evidence. We have granted a writ of error for further review and the main issue before us is whether plaintiff in error proved an accidental injury in the course of employment and its causal connection with the death of her husband.

The evidence developed before the arbitrator reveals that the deceased, fifty-four years of age, had been employed as a janitor and maintenance man by defendant in error for a period of eleven years prior to Friday, May 29, 1953. About 7:30 A.M. on the day named, while performing his regular duties, the deceased fell on a metal stairs leading to the basement of the bank, striking his head on the steps as he did so. The only witness to the fall was George Lummer, apparently a one-time employee of the bank, who described the incident as follows: "As he was going down the steps toward the last two or three steps, I don't know whether he slipped or caught his heel, but his feet went out from under him and he hit the back there of his head and he grabbed the back of his head with both hands. * * * His head hit one of the steps back there and I could hear the bump of it. It hit pretty hard." It appears that decedent did not lose consciousness or report the fall to his superiors and it was not until after his death on June 19, 1953, that his wife learned of the accident from Lummer. Decedent continued to work on the day of the occurrence but on the Saturday and Sunday that followed, spent most of his time reclining on a bed, conduct which his wife described as unusual. A daughter, who saw decedent during this period, testified that he complained about his head and that upon examination around the back of his head she felt a "big knot" there. When further questioned, however, she gave its location as being on the right side at the base of the skull.

Decedent returned to work on Monday, June 1, and worked every scheduled day thereafter to and including June 8. After working hours on the latter date, an extremely hot day, he undertook to assist a son-in-law in roofing a garage and, while so engaged, collapsed on the garage roof. From testimony of the son-in-law it appears that the witness caught decedent as he started to collapse, that decedent did not strike his head at that time, and

that the witness held the stricken man on the roof until such time as he was removed to an ambulance by firemen and taken to a hospital.

Dr. Frank Brenner, Jr., who attended the deceased upon his entry to the hospital, testified that he found the patient conscious but confused and irrational, that he was nauseated, and that he complained of a severe headache. On the basis of such objective symptoms and the case history given him, the witness diagnosed decedent's condition as illness due to hot weather and treated him accordingly. The doctor admitted that the objective symptoms of skull fracture and heat prostration could coincide, but stated he did not suspect a skull fracture because of the limited case history available to him. The doctor further testified that when he paid a call on June 12, deceased "complained bitterly" of headaches and was observed to strike his head against rungs in the top of the bedstead. It was the opinion of the witness, however, that the blows were not hard enough to cause a skull fracture. With regard to the latter portion of the doctor's testimony, plaintiff in error, who testified that she was present during the call, denied that her husband had struck his head on the bed and stated that the doctor was mistaken in so testifying.

On June 17, 1953, Dr. Walter Libmann entered the case and diagnosed decedent's illness as being either a brain injury or the result of pressure being exerted on the brain and, from X rays, determined that the patient was suffering from a skull fracture, two centimeters long, in the right temporal region. He did not, however, find any external evidence of a blow. Although usual medication for his condition was given, decedent expired on June 19. Thereafter, Dr. Libmann performed an autopsy which disclosed a lineal skull fracture in the right temporal region in front of the right ear and a subdural hematoma, or blood clot, in the left temporal region. No other injury to the head was found and it was agreed by

the medical witnesses that the pressure of the blood clot against the brain was the immediate cause of death. Dr. Libmann described the fracture as a recent one, which could have been sustained as much as sixty days prior to death, and was of the opinion that the blood forming the clot was not less than one week, nor more than two weeks old. He likewise explained that under the physical law of fluids it is a natural phenomenon, known as a *contrecoup* injury, for the blood clot to form on the side of the skull opposite from the point where the force causing the fracture was applied and that cases of subdural hematoma are cases of gradual progression, but do not have to be. Testifying as to the same matter, Dr. Brenner stated that the hematoma starts to form immediately after a blow is received, but that a man could have a skull fracture and "go along" for sixty days before becoming symptomatic.

Another medical witness before the arbitrator was Dr. Frank Mayner, a pathologist who had made an examination of the clotted blood removed from decedent's brain. It was his opinion that the blood was not more than two weeks old. He admitted, however, that it is impossible to definitely state the age of a blood clot by the exact number of days.

When the cause was reviewed by the Industrial Commission, defendant in error introduced additional medical evidence through the media of a hypothetical question posed to Drs. Mayner, Barber and Borden. Under the facts assumed in the question, one of which was that decedent struck only the back of his head when he fell on the steps, all three doctors expressed the opinion that a blow on the back of the head would not have caused a fracture in the right temporal region. It was their further opinion from the assumed facts that since the blood clot recovered at death was but an estimated fourteen days old, and composed entirely of fresh blood, it bore no relation to injury suffered on May 29, twenty-one days prior to

death. It should perhaps be noted here, that defendant in error's claim that the deceased did not receive an accidental injury during the course of his employment, and that there was no causal connection between his fall on the steps and the injury which caused his death twenty-one days later, is bottomed largely on the foregoing evidence. We think, however, that the contention loses much of its force when the opinions expressed by the doctors are measured against their statements on cross-examination. All three agreed that while unlikely, it was possible for a blow on the back of the head to cause a fracture in the temporal region, and two of the witnesses using almost identical language, stated: "I am not saying it did not happen in this case. * * * it is possible that the fracture in this case could have resulted from the injury described by the witness." Similarly, it was indicated that while it is generally true that subdural bleeding could be expected to occur to some extent immediately after fracture, it is possible for the hemorrhage to start a considerable time after injury. All agreed, too, that it was possible to have fresh bleeding and a fresh blood clot as long as a month after fracture.

Taken in its entirety, the evidence in the cause demonstrates that the deceased employee, while in the course of his employment, fell on a metal stairs and struck his head a hard blow. Apart from the conflicting testimony that he later struck his head on a bedstead in a manner which his doctor did not think sufficient to cause a skull fracture, there is no evidence of any other head injury to decedent. Indeed, the autopsy disclosed but one injury to the head. The fact remains too, that ten days after decedent fell at his employment, and before the alleged striking of his head on the bed, he became mortally ill and reflected all the objective symptoms of one suffering from a skull fracture. It is agreed by all that the condition which brought about his collapse, later determined to be a skull fracture

of recent origin and accompanying hematoma, was the immediate cause of death. With these facts established, the question of whether there was any causal connection between such accidental injury and the death becomes largely a scientific one. Even assuming that Lummer's testimony conclusively establishes that decedent struck only the back of his head on the stairs, and we are not convinced that it does so with any degree of finality, the essence of the medical testimony was that while it is unusual for a blow on the back of the head to cause a temporal fracture, it was possible for such a result to happen, and that such a possibility could not be ruled out in this case. Of similar purport is the evidence relative to the formation of the hematoma. The medical witnesses stated that although bleeding is generally expected to start immediately after the fracture, it is possible for the hemorrhage to start a considerable time after injury. Under the latter hypothesis, this would account for decedent's collapse ten days after his injury and for the recovery of fresh blood in the clot eleven days after he collapsed. In summary, therefore, it would appear that the medical testimony is as susceptible to one conclusion as the other in determining both if an accidental injury occurred during the course of employment and its causal connection with the death.

It is not within the province of a court to disturb findings of fact made by the Industrial Commission, unless manifestly against the weight of the evidence. (*Rodriguez* v. *Industrial Com.* 371 Ill. 590; *Chicago, Wilmington & Franklin Coal Co.* v. *Industrial Com.* 400 Ill. 60.) On the other hand, if the finding of the commission is against the manifest weight of the evidence it is the duty of the court to set the decision aside. (*Berry* v. *Industrial Com.* 335 Ill. 374; *Garbowicz* v. *Industrial Com.* 373 Ill. 268.) Likewise, we have held many times that it is within the province of the Industrial Commission to draw reasonable inferences and conclusions from the facts, and that courts are not

privileged to set aside a factual finding unless it is against the manifest weight of the evidence. (*Weil-Kalter Manufacturing Co.* v. *Industrial Com.* 376 Ill. 48; *Hansell-Elcock Co.* v. *Industrial Com.* 376 Ill. 151.) Also, if the undisputed facts permit an inference either way, that is, if one reasonable mind may draw one inference and another reasonable mind a different inference from such fact, the commission alone is empowered to draw the inference and its decision as to the weight of evidence will not be disturbed on review. *Lawrence* v. *Industrial Com.* 391 Ill. 80.

When the present case is measured by these principles, we are of the opinion that the circuit court erred in disturbing the finding of the commission. The evidence relating to decedent's fall, the fatal illness which followed it, and the reasonable inferences to be drawn from the testimony of the medical witnesses, were sufficient to support the finding that the decedent suffered an accidental injury arising out of and in the course of his employment and that such injury caused his death. The choice between the conflicting hypotheses and possibilities advanced by the medical witnesses was for the commission to make, and, under the entire evidence, we cannot say that its choice was unreasonable or against the manifest weight of the evidence. Cf. *Quaker Oats Co.* v. *Industrial Com.* 414 Ill. 326; *Boutwell* v. *Industrial Com.* 408 Ill. 11.

The judgment of the circuit court of Adams County is reversed and the award of the Industrial Commission is confirmed.

*Judgment reversed; award confirmed.*